**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED APRIL 23, 2008

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

No. 135248

JAMES COUZENS III,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

PER CURIAM.

At issue in this case is whether assets deposited by the custodian in an account established under the Uniform Transfer to Minors Act, MCL 554.521 *et seq.*, become the property of the principal or whether they may be withdrawn by the account's custodian for his own use. The Court of Appeals concluded that transfers made pursuant to the act are irrevocable and the custodial property placed in such an account is indefeasibly vested in the minor. We agree, and accordingly affirm the Court of Appeals decision on this issue. Defendant's application for leave to appeal on the remaining issues is denied, because we are not persuaded that the questions presented should be reviewed by this Court. In affirming the

Court of Appeals, we adopt as our own the relevant part of its unpublished opinion

per curiam, issued July 24, 2007 (Docket No. 269379):

> Defendant appeals as of right his jury trial conviction of embezzlement of $20,000 or more, MCL 750.174(5)(a), for which he was sentenced to two years' probation. We affirm.

> ## I. BASIC FACTS AND PROCEDURE

> Defendant's conviction arises out of his embezzlement of funds deposited into an account created pursuant to the Uniform Transfers to Minors Act ("UTMA"), MCL 554.521 *et seq.*[1] Barbara Couzens, defendant's ex-wife, testified that she and defendant married in 1971 and divorced in 1990. They had two children during their marriage, Kelly Couzens and James Couzens IV, or "T.J." Barbara had sole physical custody of T.J. after the divorce. The last time that defendant visited T.J. following the divorce was in the summer of 1990.

> On March 16, 1999, defendant opened an account with Brown & Company, a financial institution, pursuant to the UTMA in T.J.'s name, naming himself as the custodian of the account. T.J. was living with Barbara at that time and both were unaware of the account until T.J. filed his first income tax return [and] the IRS contacted him regarding the assets.

> At the time that defendant opened the UTMA account, he had a preexisting Brown & Company account in his name only. The UTMA account statement covering the period during which the UTMA account was opened indicated that on March 31, 1999, certain shares of stock were transferred into the account from defendant's personal account, including 300 shares of Bemis stock, 2,000 shares of Reynolds [and] Reynolds Company stock, 200 shares of DTE stock, 1,243 shares of Comerica stock, and 100 shares of Exxon Mobil stock. Likewise, the statement of defendant's personal account covering the same time period indicated that these stocks had been transferred to the UTMA account.

> In June 1999, Brown & Company issued a check in the amount of $11,989.60 payable to "James Couzens III custodian for James Couzens IV." Neither Barbara nor T.J. received proceeds from that check. In the same month, Brown & Company issued a check in the amount of $8,789.70 payable to "James Couzens III

2

custodian for James Couzens IV." Neither Barbara nor T.J. received any portion of those funds. Defendant endorsed both checks as "James Couzens III Cust James Couzens IV." The statement of the UTMA account covering April 30, 1999, through June 25, 1999, indicates that the amounts of the checks represented sales of Bemis and DTE stock. At some point, similar checks were issued in the amounts of $6,330.50 and $539.62, none of which funds T.J. received.

The value of defendant's personal account on February 25, 2000, was $153,021.95. At some point thereafter, defendant wrote a letter authorizing the transfer of certain shares of Comerica, Exxon Mobil, and Reynolds and Reynolds Company stock from the UTMA account back to his personal account. A statement of the UTMA account covering the dates July 28, 2000, through August 25, 2000, indicated that the approximate value of the account was $187,019.31 at that time. A statement of the account for the following period, August 25, 2000, through September 29, 2000, however, indicated an approximate value of $5,750.72. In addition, a statement of defendant's personal account covering the same period indicated that shares of Comerica, Exxon Mobil, and Reynolds and Reynolds Company stock were transferred to that account from the UTMA account as indicated in defendant's letter. The statement also indicated that defendant's personal account had grown to $641,449.49 by September 29, 2000.

T.J. received approximately $20,000 from accounts that he discovered in his name at Comerica Bank and Wells Fargo, but received nothing from the Brown & Company UTMA account. Further, Barbara never received any money from the UTMA account to use for T.J.'s benefit. At one point, defendant issued a check in the amount of $12,911.00 to "T.J. and Bonnie,"[2] only $6,455.50 of which was intended for T.J. He did not cash the check because it did not account for all the money that had been in the UTMA account. According to T.J., the remaining assets in the UTMA account were transferred back to defendant's personal account before T.J. turned 18, and nothing remained in the UTMA account when T.J. turned 18. At the time of trial, T.J. was still involved with the IRS, which viewed the assets deducted from the UTMA account as income and required T.J. to pay taxes on it.

Robert Kish testified that he worked with defendant for 15 years before Kish retired. Kish signed two demand notes as a

witness to defendant's signature on the notes. The demand notes list "James Couzens IV" as the borrower and defendant as the lender and purport to lend certain shares of stock to the borrower. "Custodian for James Couzens IV" is listed as the signature of the borrower. Kish testified that although he signed the demand notes, he did not read them in detail. Defendant's theory of defense at trial was that he did not intend to give T.J. the stocks, but rather, in accordance with the demand notes, the stocks were intended only as a loan for the purpose of tax planning.

The jury found defendant guilty of the charged offense. Thereafter, he moved for a directed verdict of acquittal or, in the alternative, for a new trial, both of which the trial court denied. Defendant also moved to disallow restitution, and the trial court denied that motion as well. This appeal followed.

## II. ANALYSIS

### 1. DEFENDANT'S MOTIONS FOR A DIRECTED VERDICT

Defendant first argues that the trial court erred by denying his motions for a directed verdict made during and after trial. We disagree. When reviewing a trial court's decision denying a motion for a directed verdict, made either during trial or after conviction, we review the evidence in a light most favorable to the prosecutor to determine whether a rational trier of fact could have found that the essential elements of the offense were proven beyond a reasonable doubt. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006); *People v Burgenmeyer*, 461 Mich 431, 434; 606 NW2d 645 (2000).

At the time that defendant committed the offense, MCL 750.174[3] provided, in pertinent part:

"(1) A person who as the agent, servant, or employee of another person, governmental entity within this state, or other legal entity or who as the trustee, bailee, or custodian of the property of another person, governmental entity within this state, or other legal entity fraudulently disposes of or converts to his or her own use, or takes or secretes with the intent to convert to his or her own use without the consent of his or her principal, any money or other personal property of his or her principal that has come to that person's possession or that is under his or her charge or control by virtue of his or her being an agent, servant, employee, trustee, bailee, or custodian, is guilty of embezzlement.

4

\* \* \*

"(5) If any of the following apply, the person is guilty of a felony punishable by imprisonment for not more than 10 years or a fine of not more than $15,000.00 or 3 times the value of the money or property embezzled, whichever is greater, or both imprisonment and a fine:

"(a) The money or personal property embezzled has a value of $20,000.00 or more."

In *People v Lueth*, 253 Mich App 670, 683; 660 NW2d 322 (2002), this Court articulated the elements of embezzlement by an agent pursuant to the statute as follows:

"(1) the money in question must belong to the principal, (2) the defendant must have a relationship of trust with the principal as an agent or employee, (3) the money must come into the defendant's possession because of the relationship of trust, (4) the defendant dishonestly disposed of or converted the money to his own use or secreted the money, (5) the act must be without the consent of the principal, and (6) at the time of conversion, the defendant intended to defraud or cheat the principal."

An additional element of the crime charged in this case is that the property embezzled be worth $20,000 or more. MCL 750.174(5)(a). Defendant argues that the prosecutor failed to establish elements (1), (3), (4), and (6).

Regarding the first element, defendant contends that stocks used to fund the UTMA account did not belong to the principal, his son T.J., because there was no valid common-law gift of the stocks and no valid account was created pursuant to the UTMA. The prosecutor's theory was not that there existed a valid common-law gift of the stocks, but rather, that defendant conveyed the stocks to T.J. via a lawful UTMA account. The prosecutor presented as evidence the account documents showing that defendant opened the account in T.J.'s name and that defendant identified himself as the custodian of the account. The prosecutor also presented as evidence the statements of both the UTMA account and defendant's personal account, showing that, to fund the account, defendant transferred certain shares of stock from his personal account into the UTMA account.

5

Defendant argues that no valid UTMA account existed because following the formalities of the UTMA created only the presumption of a gift, which may be rebutted by clear and convincing evidence showing a lack of donative intent. In support of his argument, defendant relies on case law from other jurisdictions.[4] The plain language of the UTMA, however, makes no mention of a rebuttable presumption of donative intent. Rather, it states that custodial property is created and a transfer is made pursuant to procedures enumerated in MCL 554.533. Defendant does not argue that he did not satisfy those procedures. In addition, Robert Huth, the prosecutor's expert witness, testified that deposits made into a UTMA account are irrevocable. Because the language of the UTMA cannot be read as creating a rebuttable presumption of donative intent regarding transfers under the act, and the prosecutor presented evidence as such at trial, defendant's argument that such a presumption exists lacks merit.

Even if a rebuttable presumption of donative intent did exist, however, defendant did not present evidence that, viewed in the light most favorable to the prosecution, rebutted such a presumption. Defendant relies on two demand notes, which he argues shows that the stocks were intended merely as loans and not as gifts. Robert Kish, defendant's former coworker and friend, testified that he signed the demand notes as a witness, but did not read them in detail. He further testified that he thought that he signed the demand notes on the same day, although he was not sure. Because the demand notes cover transfers that were made several months apart, Kish's testimony tended to support the prosecutor's argument that the demand notes were a sham.

Further supporting the prosecutor's argument is that, according to the demand notes, "the borrower," or T.J., is entitled to dividend income, but both T.J. and his mother, defendant's ex-wife, testified that they received nothing from the UTMA account. In addition, it is questionable whether the demand notes are dated and, if they are dated, whether they are dated correctly. The demand note purportedly dated December 1, 1999, pertains to a transfer that was completed sometime before September 19, 1999, the date on which the stocks were transferred from the UTMA account back into defendant's personal account. Thus, the shares of stock at issue in the demand note could not have been loaned to the UTMA account

6

pursuant to the demand note if it did not yet exist.[*]  Alternatively, if the demand note's reference to "12/1/99" was not meant to reflect the date of the demand note, then it was simply not dated.  Either alternative tends to support the prosecutor's argument that the notes were a sham.  Accordingly, even if following the procedures outlined in the UTMA created only a rebuttable presumption of donative intent, as defendant argues, viewing the evidence in a light most favorable to the prosecution, defendant did not overcome the presumption.  Therefore, a rational trier of fact could have determined that a valid UTMA account was created and that the assets placed in the account belonged to T.J., the principal, and not to defendant.

Defendant also argues that the prosecutor failed to establish the third element, i.e., that the money came into defendant's possession because of a relationship of trust.  Defendant asserts that he did not gain access to the assets because of a relationship of trust because he owned the stocks before he transferred them to the UTMA account.  Once the assets were transferred, however, the transfer was irrevocable under MCL 554.528, which provides that "[a] person may make a transfer by *irrevocable* gift . . . ." (Emphasis added.)  In addition, MCL 554.536(2) states that transfers are irrevocable, "and the custodial property is indefeasibly vested in the minor . . . ."  The prosecutor presented evidence of the irrevocability of transfers when Huth testified as such.  Therefore, a reasonable trier of fact could have determined that defendant's access to and control over the assets after the transfer was only by virtue of his capacity as custodian.

Defendant also asserts that he was permitted[,] pursuant to his broad authority granted under MCL 554.538 of the UTMA, to fund the UTMA account with demand notes that he was able to then permissibly retransfer to his own account.  MCL 554.538 provides:

"A custodian, acting in a custodial capacity, has the rights, powers, and authority over custodial property that an unmarried adult owner has over his or her own property, but a custodian may exercise those rights, powers, and authority in that capacity only.

---

[*] While defendant claims that the UTMA assets were retransferred to his personal account on September 19, 2000 (not September 19, 1999), the timing of the transfer does not affect the primary issue in this case.

7

This section does not relieve a custodian from liability for breach of section 17."

As previously stated, a rational trier of fact could have determined that the demand notes were a mere sham. Thus, regardless of whether MCL 554.538 granted defendant broad authority with respect to funding the UTMA account, a trier of fact could have determined that defendant's access to the stocks after they were transferred to the UTMA account was only by virtue of his capacity as custodian and that the assets came into defendant's possession because of a relationship of trust.

Defendant also argues that the prosecutor failed to establish the fourth element of embezzlement by an agent of $20,000 or more, i.e., that he dishonestly disposed of or converted the money to his own use or secreted the money. The prosecutor's evidence, however, showed that certain shares of stock from the UTMA account were sold and T.J. received none of the sale proceeds. Moreover, the evidence showed that defendant retransferred all assets from the UTMA account back into his own personal account, leaving nothing in the UTMA account.

Defendant relies on MCL 554.537(2), which he argues allowed him to retain any property that he transferred to the UTMA account. Although defendant relies only on the italicized language below, subsections (1) and (2) of MCL 554.537 state, in pertinent part:

"(1) A custodian shall do all of the following:

"(a) Take control of custodial property.

"(b) Register or record title to custodial property if appropriate.

"(c) Collect, hold, manage, invest, and reinvest custodial property.

"(2) In dealing with custodial property, a custodian shall observe the standard of care that would be observed by a prudent person dealing with property of another. If a custodian has a special skill or expertise or is named custodian on the basis of representations of a special skill or expertise, the custodian shall use that skill or expertise. However, *in the custodian's discretion and*

8

*without liability to the minor or the minor's estate, a custodian may retain any custodial property received from a transferor.* [Emphasis added.]"

When interpreting statutory language, courts must ascertain the legislative intent that may reasonably be inferred from the words in a statute. *Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). Courts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that renders nugatory or surplusage any part of a statute. *Id*. Moreover, words and phrases used in an act should be read in context with the entire act and assigned such meanings as to harmonize with the act as a whole. *G C Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 421; 662 NW2d 710 (2003). Likewise, under the doctrine of *noscitur a sociis*, a word or phrase should be given meaning by its context or setting. *Id*. at 420; *Koontz, supra* at 318.

Applying these principles and reading the provisions of subsections (1) and (2) of MCL 554.537 together, defendant's contention that the above-italicized language permitted him to retain any property transferred to the UTMA account lacks merit. Under subsection (1), defendant was required to take control of any custodial property, register or record the property if appropriate, and hold and invest the property. The use of the word "shall" in subsection (1) rendered these duties mandatory. In addition, under subsection (2), defendant was required to observe the standard of care appropriate when "dealing with [the] property of another." These provisions are inconsistent with defendant's contention that he was authorized to retain any custodial property for his own personal use. Thus, harmonizing the statutory provisions and applying the doctrine of *noscitur a sociis*, defendant's argument is unavailing. Further, defendant's contention conflicts with the language of MCL 554.528 and MCL 554.536(2), providing that transfers are irrevocable.

Defendant also argues that pursuant to MCL 554.540(1), he was permitted to be reimbursed from the custodial property for reasonable expenses incurred in the performance of his duties as custodian. MCL 554.540(1) provides:

"A custodian is entitled to reimbursement from custodial property for reasonable expenses incurred in the performance of the custodian's duties. *Except for a person who is a transferor under section 8*, a custodian has a noncumulative election during each

9

calendar year to charge reasonable compensation for services performed during that year. [Emphasis added.]"

Because defendant retained all proceeds of the UTMA account, retransferred the assets from the account to his own personal account, and left nothing in the account for T.J., a reasonable trier of fact could conclude that he converted the assets to his own use rather than reimbursed himself for reasonable expenses incurred as custodian of the UTMA account. At best, defendant offered T.J. only $6,455.50 of the assets in the account, but T.J. did not cash defendant's check because it did not account for all the funds that were deposited into the UTMA account. Moreover, the language of the italicized provision above specifically states that defendant was not entitled to reimbursement because he was the transferor of the assets deposited into the account. Therefore, defendant's reliance on MCL 554.540(1) is misplaced. Given the facts and circumstances of this case, a rational trier of fact could have concluded that defendant dishonestly disposed of or converted the money to his own use.

Finally, defendant contends that the prosecutor failed to prove the sixth element, i.e., that, at the time of conversion, defendant intended to defraud or cheat the principal. For the foregoing reasons, a reasonable trier of fact could have concluded that defendant intended to defraud or cheat T.J., the principal. Although defendant argues that any action with respect to his duties as custodian should have been pursued in the probate court, he provides no authority that the probate court provided the only remedy for his conduct and that he could not also be subject to criminal charges. Viewed in a light most favorable to the prosecution, sufficient evidence existed from which a rational trier of fact could have found that the essential elements of the offense were proven beyond a reasonable doubt. *Gillis*, *supra* at 113; *Burgenmeyer*, *supra* at 434. Accordingly, the trial court properly denied defendant's motions for a directed verdict made during and after trial.

_____

[1] The Uniform Gifts to Minors Act preceded the UTMA and was repealed by 1998 PA 433.

[2] Identified in defendant's brief on appeal as a relative.

[3] MCL 750.174 was amended by 2006 PA 573, effective March 30, 2007, but the amendment does not affect this appeal.

10

Pursuant to the amendment, the act now provides for different punishments based on whether the amount of money embezzled was at least $20,000 but less than $50,000, at least $50,000 but less than $100,000, or over $100,000.

[4] Specifically, defendant relies on *In re Marriage of Agostinelli*, 250 Ill App 3d 492; 620 NE2d 1215 (1993), *Heath v Heath*, 143 Ill App 3d 390; 493 NE2d 97 (1986), and *Gordon v Gordon*, 70 AD2d 86; 419 NYS 2d 684 (1979).

_____

Affirmed.

Clifford W. Taylor
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman