# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 3, 2015

Plaintiff-Appellee,

v

No. 317929
Oakland Circuit Court
LC No. 2012-244124-FH

JAMES ELRICO MALOY,

Defendant-Appellant.

Before:  BECKERING, P.J., and JANSEN and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right from his bench-trial conviction of first-degree home invasion, MCL 750.110a(2).  He was sentenced as a third habitual offender, MCL 769.11, to 114 to 480 months in prison.  We affirm defendant's conviction and sentence.

## I.  STATEMENT OF FACTS

## A.  THE HOME INVASION

Defendant's conviction arose out of the home invasion of an apartment on October 1, 2012.  Three of the apartment's four residents—Brenda Jones and her daughters Gennifer and Lacey—were home and sleeping in their separate bedrooms at the time of the break-in. Gennifer testified that she was awakened at about 5:45 a.m. when she "heard a loud boom." After hearing a second noise, Gennifer "got up instantly and walked to the door" of her bedroom. While standing by the door, a "tall black guy" opened her door.  She did not recognize the person at that time, but after discussing the situation with family members, she recalled that she had seen the individual, later identified as defendant, at her sister's graduation party.  Defendant, whom Gennifer's mother referred to as "Jay," then took the television out of Gennifer's room. Gennifer recalled that there was another individual in the apartment with defendant, but she did not know the identity of that person.

Brenda similarly recalled that she awoke to the sound of a noise, which she assumed was the noise caused by the front door to the apartment being kicked in.  Because of the noise, she got out of her bed, opened her bedroom door, and observed two gentlemen in the apartment.  She described the first gentleman as taller than her and "entering . . . the bathroom on my daughters' side of the apartment," where he "turned on the light."  She then observed that individual, who she believed was defendant, approach her daughter's bedroom, so she started to approach him

-1-

but was unable to do so because the "other gentleman came towards" her. Brenda testified that she had previously met defendant on two occasions—her daughter Lacey's graduation party and the next day at a birthday party held for Brenda's niece to which they invited defendant. Brenda testified that while the graduation party occurred at the community room that was part of the apartment complex, the birthday party was at her home so defendant was familiar with the layout of the apartment. She testified that she immediately believed that the individual who turned on the bathroom light was defendant. In addition to thinking the intruder was "Jay" both initially and when she observed him by the light in the bathroom, when she saw defendant pass by her with the television, she recalled saying "that's Jay, [w]hy is Jay doing this?"

Like Brenda, Lacey testified that the person later identified as defendant seemed familiar to her when she observed him in the home. Lacey recalled that, when she peaked out of her bedroom after being awakened, she observed defendant in the bathroom, turning on the light. After seeing defendant in the bathroom, Lacey saw him come to her room and kick open her door.

Although the police did locate a large palm print on one of the doors of the apartment, they were unable to lift any fingerprints from it. Gennifer, Brenda, and Lacey all identified defendant from a photographic lineup as one of the individuals who committed the break-in. The photographic lineup consisted of six photographs of different individuals, one of which was defendant. Each of the victims also identified defendant as the perpetrator at trial. However, while each identified defendant, both Brenda and Lacey testified that they were only about 80 percent sure that defendant was the individual that broke into their apartment. Brenda also testified that one of the reasons why she was uncertain was because she had been told by her boyfriend that "Jay hadn't been working with them and that he might be in jail." Lacey, while testifying that she was only 80 percent sure, also testified in response to two separate questions that she "believed" defendant was one of the people who broke into her home.

Gennifer was much more emphatic with her identification of defendant. On cross-examination, Gennifer testified that she was not "mistaken with anybody else." She also testified that she was sure it was defendant because she had also seen a photograph of defendant that had been taken by her mother at the party. While Gennifer did say at one point during cross-examination that she was "not sure" because she did not see the intruder's face head-on, she clarified during re-direct examination:

> *Q*. The person you identified in the courtroom as being the person in your house, the person that was questioning you,[1] is that the person that was in your house?
>
> *A*. Yes, well, from the lineup and also from the picture that I saw, yes. I'd say yes.

---

[1] As will be discussed in more detail, defendant chose to conduct cross-examination of both Gennifer and Brenda despite also being represented by appointed counsel. The trial court permitted this arrangement without any discussion of this hybrid representation on the record.

*Q*. Are you certain that the person that you're identifying in the courtroom is the person that did the home invasion?

*A*. Yes.

On recross-examination, Gennifer was even more certain of her identification of defendant. She responded "yes" when defendant asked her if she could be "100 percent certain to say that I was in your house that morning."

## B. DEFENDANT'S REPRESENTATION

Defendant requested a court-appointed attorney on or about December 4, 2012. The district court granted defendant's request on December 12, 2012. However, while the district court granted the request, defendant refused to sign the verification portion of the form. Defendant's preliminary examination occurred the next day, December 13, 2012. At that time, defendant informed the court that he was representing himself. The district court reminded him that it had appointed an attorney for him, "one of the best criminal defense attorneys in the county," and confirmed that defendant was rejecting the services of that attorney and would be "appearing on [his] own behalf." Defendant confirmed that it was his wish to do so. The district court then asked defendant specific questions regarding his decision to waive his right to an attorney:

*THE COURT*: And you understand your Constitutional right is not to represent yourself. Your Constitutional right is to have a lawyer. And you're waiving that right, correct?

*THE DEFENDANT*: Yes, ma'am.

*THE COURT*: Understanding that the Court appointed one, and you could have had a lawyer, and you've given up your right?

*THE DEFENDANT*: Yes, ma'am.

*THE COURT*: Okay.

Defendant then proceeded to represent himself at the preliminary examination.

Defendant's trial began on June 3, 2013. The transcript does not indicate that defendant ever requested to continue to represent himself at the trial. Rather, defense counsel placed on the record defendant's desire to waive his right to a jury trial and also informed the court that defendant had rejected the *Cobbs*[2] plea offered by the prosecution. The lower court file does not indicate any specific request from defendant to represent himself at trial. There is a letter, attached to defendant's motion to suppress the identification testimony, in which defendant

---

[2] *People v Cobbs*, 443 Mich 276, 283; 505 NW2d 208 (1993).

-3-

expresses his dissatisfaction with his appointed counsel and that he "will not accept him or any other attorney on [his] case" and that he would "proceed pro-per." On January 31, 2013, prior to the motion to suppress being filed by defendant on his own behalf, defendant's appointed counsel filed a discovery demand as well as a demand for the preliminary examination transcript. The record is devoid of any order from the court releasing appointed counsel from the case, or any motion or request from defendant's counsel seeking to withdraw from the case.

After defendant's jury waiver and *Cobbs* plea rejection, the trial court permitted defendant to give his own opening statement and to conduct his own cross-examination of the witnesses offered during the prosecution's case-in-chief. However, the transcript establishes that defendant consulted with appointed counsel several times during the prosecution's case-in-chief and that defendant's counsel (1) made an oral motion for a directed verdict following the prosecution's case-in-chief, (2) stipulated to the admission of evidence, (3) conducted the direct and redirect examination of defendant, (4) conducted cross-examination of the prosecution's rebuttal witness, and (5) made the closing argument. Counsel also represented defendant during sentencing on June 19, 2013.

## C. MOTION FOR DIRECTED VERDICT

Counsel moved for a directed verdict based on the lack of evidence of defendant's identity as one of the perpetrators of the home invasion. The trial court rejected defendant's argument:

> *THE COURT*: All right. I think this is probably a better motion—or closing argument because we had two witnesses on the stand, and I'm looking at this in the light most favorable to the non-moving party. Both witnesses, one 100 percent sure, one 80 percent sure it was the defendant. And they had seen him before. And so I think there is an issue for the finder of fact as to whether or not a home invasion was committed by the defendant.

## D. ALIBI DEFENSE

Defendant took the stand in his own defense. Defendant confirmed that he had been at the apartment in August 2012 for the graduation party as well as a pool party the next day. He admitted that he knew Brenda from those parties but denied knowing Gennifer, testifying that he had never seen her until the day of the trial. Defendant testified that he had an alibi for the date and time of the home invasion, claiming he was home getting ready to be in court at the Frank Murphy Hall of Justice in Detroit. Specifically, he testified that he had to be in court at 8:00 a.m. regarding an unlawful driving away of an automobile (UDAA) charge from Redford, Michigan. He did not recall the specific court proceeding, but believed he was at court for about 15 or 20 minutes. He testified that he got to the court that day by taking the "Woodward Bus to the Gratiot at 6:00 a.m." and that he had to take two different buses to get to court by 8:00 a.m.

In support of this alibi, a Wayne Circuit Court Register of Actions for a criminal case against defendant was admitted into evidence. The register established that an order for the production of the preliminary examination transcript from Seventeenth District Court was signed and filed on October 1, 2012. On cross-examination, the prosecution had defendant confirm

again that he was at the Frank Murphy Hall of Justice on October 1, and that that location was separate from the Seventeenth District Court. Defendant was also questioned about the fact that he had called a friend to testify about his whereabouts at the preliminary examination, but that the friend was unable to confirm where defendant was on October 1 because she had not seen him that day, only speaking to him by telephone.

Defendant also testified that while he had been to the victims' apartment before October 1, he was not familiar with the location of the bathroom. He disagreed with witness Cymanda (Sam) Williams, the apartment's fourth occupant, that he had been to the home three times before October 1, claiming to have only been there on two occasions.

### E. CONVICTION AND SENTENCE

Following the prosecutor's rebuttal argument, which focused on Brenda's perception that she immediately thought the perpetrator was defendant, the court rendered its verdict of guilty, stating:

*THE COURT:* All right. The matter has been tried to the Court. Charge: home invasion first degree.

The prosecutor must prove each element of the crime beyond a reasonable doubt.

First, that the defendant entered a dwelling without permission.

Second, that when the defendant entered the dwelling, he intended to commit a larceny, or when he was leaving, he committed the offense of larceny.

And third, when the defendant entered, was present in, or leaving the dwelling, either of the following circumstances existed: Another person was lawfully present in the dwelling.

Well, I think the elements have been proven beyond a reasonable doubt. I don't think there's any question in this case somebody came in and kicked the door in. Somebody stole a TV. And that the three people that were living there were lawfully there at the time.

The Court does make the following findings:

Three witnesses independently identified the defendant. That the person who did this is someone who knew the layout of the home, where the bathroom was, where the switch was, when they entered a dark residence. The person knew the layout. Again, they knew the scene. They knew Mr. Williams, his work habits, and that his car was gone.

The Court does find the defendant, Mr. Maloy, beyond a reasonable doubt committed the crime of home invasion first degree.

-5-

He was known to those who ID'd him. So whether the view was full-on or a side view, the structure, mannerisms were sufficient to make the three independent IDs.

In addition, the Court finds that the register of actions which was admitted as exhibit A, and the Court reviewed what occurred on October 1, 2012, does not find the presence of the defendant for a court hearing. At best, a transcript was signed and filed.

Mr. Maloy knew this family. He knew their habits. And he took advantage of them by going in when they were vulnerable, kicking the door, and removing property.

So the Court does find the defendant guilty.

The prosecution then inquired whether defendant would be sentenced as a third habitual offender. The court responded in the affirmative, and then asked the prosecution if it wanted the court to "take care of that today or at sentencing." Defense counsel stated that he would prefer to take care of it at sentencing, which was scheduled for June 19, 2013.

A presentence investigation report (PSIR) was completed. The PSIR noted that defendant had a pending UDAA charge and that he was also on parole at the time of this incident. The PSIR also noted that defendant had been convicted of two previous felonies and three previous misdemeanors. The sentencing guidelines for defendant prescribed a minimum sentence of between 72 and 180 months in prison. The PSIR explained that because defendant was on parole at the time of the offense, he should be awarded 0 days of jail credit. The PSIR recommended a sentence of 126 months to 40 years.

At sentencing, defendant's counsel stated that he believed the guidelines, which commenced at 72 months, were correct. He also reminded the trial court that the case was a bench trial in which defendant "basically represented himself with the exception of [counsel being] given the privilege of having the direct examination of [defendant] who testified during the trial." The court then placed the relevant facts pertaining to the habitual third charge on the record, with defendant admitting that he was convicted of two felonies on February 1, 1993. The court permitted defendant to make a statement for the record. The court sentenced defendant to 114 months to 480 months in prison, noting that this was "less than what was recommended."

## II. DEFENDANT'S CLAIMS ON APPEAL

Defendant's appellate counsel has brought forth five claims of error. Defendant has brought additional claims of error by way of a supplemental brief filed *in propria persona* pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4.

-6-

## A. DEFENDANT'S *BRADY*[3] VIOLATION CLAIM

Defendant first argues that his conviction must be overturned because of alleged *Brady* violations on the part of the prosecution. Because we do not find any facts supporting a *Brady* violation, we disagree.

Generally, for an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court." *People v Metamora Water Serv*, 276 Mich App 376, 382; 741 NW2d 61 (2007). In this case, defendant requested that all exculpatory evidence be provided to him and also filed a discovery demand. However, defendant did not inform the court before trial of any concern that the information requested was not provided. Accordingly, this issue was not properly preserved and our review is for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

"Due process requires the prosecution to disclose evidence in its possession that is exculpatory and material, regardless of whether the defendant requests the disclosure." *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007), citing *Brady*, 373 US at 87. To establish a *Brady* violation, a defendant must prove that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). In determining whether the suppressed and favorable evidence is material to the case, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 157; see also *Kyles v Whitley*, 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1995).

In the instant case, defendant requested all exculpatory evidence during the preliminary examination. Defendant also specifically asked for "copies of all written and recorded statements by witnesses." In response to these inquiries and requests, the prosecution noted that Williams did not provide a written statement and informed the district court that "[e]verything we have, he has it, your Honor." The district court then specifically asked the prosecution if this included fingerprint analysis and photographs, which the prosecution responded to by again repeating that defendant had "everything we have." The district court also instructed the prosecution to provide anything else that it might obtain, including any video, "if it exists." The prosecution agreed to do so. The record establishes that the prosecution provided defendant with 15 pages of discovery information on February 14, 2013. Defendant never claimed during trial that this information was not provided or that there was additional information that should have been provided. Accordingly, while defendant has claimed that the prosecution failed to provide him with exculpatory evidence, there is simply no record support for this assertion. Defendant has failed to provide any specifics regarding the information allegedly withheld or identify any information that was actually withheld. We perceive no error on this issue.

## B. DIRECTED VERDICT CLAIM

---

[3] *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

Defendant next argues that the trial court erred when it denied his motion for a directed verdict. We disagree.

The trial court denied defendant's motion on the record. Accordingly, this issue has been properly preserved for appellate review. *Metamora Water Serv*, 276 Mich App at 382. In addition, to the extent defendant's appellate request is based on an insufficiency of the evidence argument, defendant was not required to take any steps to preserve this issue for appeal. *People v Williams*, 294 Mich App 461, 471; 811 NW2d 88 (2011); *People v Cain*, 238 Mich App 95, 116-117; 605 NW2d 28 (1999).

"A challenge to the trial court's decision on a motion for a directed verdict has the same standard of review as a challenge to the sufficiency of the evidence." *People v Lewis* (*On Remand*), 287 Mich App 356, 365; 788 NW2d 461 (2010); see also *People v Couzens*, 480 Mich 240, 244; 747 NW2d 849 (2008). The difference is that only the evidence presented before the motion for a directed verdict was made is considered. *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979); see also *People v Allay*, 171 Mich App 602, 605; 430 NW2d 794 (1988). When reviewing a trial court's decision on a motion for a directed verdict, the evidence is viewed de novo "in a light most favorable to the prosecution" to determine "whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Riley* (*After Remand*), 468 Mich 135, 139-140; 659 NW2d 611 (2003). The trial court, in ruling on a directed verdict, cannot determine the credibility of witnesses and this remains true "no matter how inconsistent or vague that testimony might be." *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997). "A directed verdict of acquittal is appropriate only if, considering all the evidence in the light most favorable to the prosecution, no rational trier of fact could find that the essential elements of the crime charged were proven beyond a reasonable doubt." *Id*.

Defendant's directed verdict motion was based solely on the prosecution's alleged failure to present sufficient evidence of identification.[4] "[I]dentity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).

Defendant has argued, without any case law in support of his position, that because Brenda testified that she was only "80 percent" sure that defendant was one of the perpetrators, and because Gennifer testified ambiguously about whether she was 100 percent sure that defendant was one of the perpetrators, the prosecution simply could not establish defendant's guilt beyond a reasonable doubt. However, while Brenda testified that she was only 80 percent certain of her identification of defendant, she also testified that the perpetrator was familiar to

---

[4] The only issue was whether defendant was proven to be a perpetrator of the home invasion beyond a reasonable doubt. Because there was no argument below or on appeal that the elements of home invasion were not established beyond a reasonable doubt, we will not address the elements of home invasion herein.

her, had familiarity with the apartment, including where the bathroom light was located, and that she immediately believed it was defendant even before she saw him turn on the bathroom light.

Gennifer was even more certain regarding defendant's identity. While she at one point testified during cross-examination that she was "not sure," on redirect examination she clarified that this was because of the questioning she received from defendant, and that she was "certain that the person that [she] identif[ied] in the courtroom [was] the person that did the home invasion." The person she identified in the courtroom was defendant. She also testified on recross-examination that she was "100 percent certain" that it was defendant that was in her house on the day of the home invasion.

As noted above, "it is not permissible for a trial court to determine the credibility of witnesses in deciding a motion for a directed verdict of acquittal, no matter how inconsistent or vague that testimony might be." *Mehall*, 454 Mich at 6. Our Supreme Court has made it clear that "[i]t is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002); see also *Bennett*, 290 Mich App at 472; *Yost*, 278 Mich App at 356. A rational trier of fact could determine based on the testimony of Gennifer, Brenda, and Lacey, as well as reasonable inferences arising from their testimony, that defendant was the individual who committed the home invasion. The trial court did not err by denying defendant's motion for a directed verdict.

### C. DEFENDANT'S SEPARATION OF POWERS CLAIM

Defendant also argues that the trial court violated the separation of powers doctrine by issuing an order permitting the Department of Corrections to make an ability-to-pay determination regarding reimbursement of attorney fees to the county. We disagree. This Court reviews unpreserved constitutional issues for plain error affecting defendant's substantial rights. *People v Vaughn*, 491 Mich 642, 654; 821 NW2d 288 (2012); see also *Carines*, 460 Mich at 763-764.

Defendant apparently believes that the trial court's orders permitting the Department of Corrections to collect outstanding fees for purposes of reimbursing the county for attorney fees and other costs associated with his trial and conviction violate the separation of powers. Defendant has relied almost exclusively on federal law in support of this argument. The only Michigan case directly on point referenced by defendant is *People v Jackson*, 483 Mich 271; 769 NW2d 630 (2009). However, defendant's reliance on *Jackson* is misplaced. In *Jackson*, our Supreme Court made it clear that MCL 769.1k

> allows for the imposition of a fee for a court-appointed attorney irrespective of a defendant's ability to pay, and [MCL 769.1*l*] allows the trial court to order that a prisoner's prison account be reduced to satisfy costs imposed under § 1k. This is usually accomplished by a remittance order, which also does not require an ability-to-pay analysis. [*Jackson*, 483 Mich at 286.]

*Jackson* also specifically held that the procedure set forth in MCL 769.1k and MCL 769.1*l* is constitutional:

Defendant initially claims that MCL 769.1k is unconstitutional when trial courts apply it to impose a fee for a court-appointed attorney without conducting a presentence ability-to-pay analysis. We disagree because, as noted earlier, there is no constitutionally required ability-to-pay analysis until the fee is actually enforced.

Defendant also argues that MCL 769.1*l* is unconstitutional because it is an enforcement of the imposition of a fee for a court-appointed attorney, yet it does not require an ability-to-pay analysis. Defendant correctly notes that when a prisoner, like himself, has had a fee for a court-appointed attorney imposed on him, § 1*l* allows a trial court to order the Department of Corrections to "deduct 50% of the funds received by the prisoner in a month over $50.00 and promptly forward a payment to the court as provided in the order when the amount exceeds $100.00. . . ." We acknowledge that this procedure is an enforcement of the fee without an ability-to-pay assessment. *But we decline to hold that this enforcement procedure is unconstitutional, because the statute's monetary calculations necessarily conduct a preliminary, general ability-to-pay assessment before the prisoner's funds are taken.*

. . . . In other words, as long as it does not require indigent defendants to pay a fee, a procedure that enforces the fee is not unconstitutional simply because it does not require an ability-to-pay analysis. Indeed, the true issue is always indigency, no matter what test is used to evaluate the issue. And application of § 1*l*'s calculative procedure necessarily only applies to prisoners who have an apparent ability to pay.

* * *

We acknowledge that one's indigency is an individualized assessment and that § 1*l*'s presumption does not result from a full individualized analysis of a prisoner's indigency. Accordingly, if a prisoner believes that his unique individual financial circumstances rebut § 1*l*'s presumption of nonindigency, he may petition the court to reduce or eliminate the amount that the remittance order requires him to pay. However, because we adjudge a prisoner's indigency at the time of enforcement on the basis of manifest hardship and because a prisoner is being provided all significant life necessities by the state, we caution that the imprisoned defendant bears a heavy burden of establishing his extraordinary financial circumstances. . . . Specifically, when reviewing a prisoner's claim, lower courts must receive the prisoner's petition and any proofs of his unique and extraordinary financial circumstances. . . . *The trial courts are under no obligation to hold any formal proceedings.* They are only required to amend the remittance order when § 1*l*'s presumption of nonindigency is rebutted with evidence that enforcement would impose a manifest hardship on the prisoner or his immediate family. . . . [*Jackson*, 483 Mich at 294-297 (emphasis added).]

-10-

In short, nothing in the trial court's orders in this case, or under MCL 769.1*l*, usurps the trial court's constitutional power to hold an ability-to-pay hearing should one be requested by the prisoner.

> Our decision today does not affect the minimal due process requirements that entitle a defendant to notice and an opportunity to be heard regarding the enforcement of earlier imposed costs and fees. Indeed, whenever a trial court attempts to enforce its imposition of a fee for a court-appointed attorney under MCL 769.1k, the defendant must be advised of this enforcement action and be given an opportunity to contest the enforcement on the basis of his indigency. *Thus, trial courts should not entertain defendants' ability-to-pay-based challenges to the imposition of fees until enforcement of that imposition has begun. . . .* Nonetheless, once enforcement of the fee imposition has begun, and a defendant has made a timely objection based on his claimed inability to pay, the trial courts should evaluate the defendant's ability to pay. [*Jackson*, 483 Mich at 292-293 (footnotes omitted; emphasis added).]

Accordingly, because our Supreme Court has specifically held that MCL 769.1k and MCL 769.1*l* are constitutional, and since the trial court appropriately relied on these statutes when entering the orders regarding reimbursement in this case, we conclude that defendant's constitutional challenge fails. This is especially true given that this issue was unpreserved, as defendant cannot establish plain error affecting his substantial rights. *Carines*, 460 Mich at 763-764.[5]

## D. DEFENDANT'S ARRAIGNMENT CHALLENGE

Defendant also argues for the first time on appeal that the trial court erred by failing to arraign him. He contends that while the record indicates that his defense attorney filed a waiver of arraignment form, he did not consent to the waiver despite the form saying otherwise. We do not find defendant's claim to have merit. Because defendant failed to preserve this issue, our review is limited to plain error on the existing record. *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013).

Defendant has not provided any case law in support of his position. Rather, he argues on appeal that he never signed the waiver of arraignment form and that he did not give his attorney consent to waive the arraignment. Defendant's argument is extremely similar to the argument of the defendant in *Nix*, 301 Mich App 195. There, the defendant argued that despite a waiver of

---

[5] To the extent defendant has also argued that his counsel was ineffective in failing to argue that this procedure was a violation of separation of powers, we also disagree. Because the trial court properly applied *Jackson* and the applicable statutes to this issue, any argument or objection by defendant's counsel would have been without merit and futile, and therefore counsel was under no obligation to make any such argument or objection. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW23d 120 (2010).

arraignment form in the record, "he did not agree to this waiver." *Nix*, 301 Mich App at 208. In rejecting the *Nix* defendant's assignment of error, this Court stated:

> [D]efendant has not established prejudice. A showing of prejudice is required to merit relief for the failure to hold a circuit court arraignment. MCR 6.113(A). "The purpose of an arraignment is to provide formal notice of the charge against the accused." *People v Waclawski*, 286 Mich App 634, 704; 780 NW2d 321 (2009). Defendant had notice of the charges against him because he had access to the information and he was present at the preliminary examination at which he was bound over for trial on the charges. Although defendant claims ignorance of the fourth-offense habitual offender enhancement, a sentencing enhancement notice was included in the information. [*Nix*, 301 Mich App at 208.]

Similarly, here, defendant was present at his preliminary examination. Indeed, he chose to represent himself at the preliminary examination. Unlike in *Nix*, defendant has not alleged that he was unaware that he was being charged as an habitual offender. The district court noted on the record at the preliminary examination that defendant was facing a maximum of 20 years in prison "unless there's a habitual charge." The prosecution filed its notice to seek an enhanced sentence six days after the preliminary examination hearing. The notice set forth the charge of first-degree home invasion, explained defendant's two previous felony convictions, and noted that there was a maximum sentence of 40 years based on the enhancement. Even if we agreed with defendant that he did not agree to the waiver, it is clear that defendant was on notice of the charges against him. Therefore, no prejudice occurred based on the alleged failure to arraign defendant or to ensure that defendant had agreed to the waiver. *Nix*, 301 Mich App at 208.

### E.  INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Defendant next argues that his counsel was ineffective for failing to meet with him in order to prepare for trial—namely, to ensure that phone records were obtained in support of his alibi defense. We disagree.

Defendant filed a motion to remand in this Court, which was denied.[6] Because there was no evidentiary hearing, our review of this issue "is limited to mistakes apparent on the record." *People v Rodriguez*, 251 Mich App 10, 38; 650 NW2d 96 (2002).

To establish ineffective assistance of counsel, a defendant must establish that his attorney's performance "fell below objective standards of reasonableness, and that it is reasonably probable that the results of the proceeding would have been different had it not been for counsel's error." *People v Frazier*, 478 Mich 231, 243; 733 NW2d 713 (2007), citing *Strickland v Washington*, 466 US 668, 687, 690, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984); see also *People v Effinger*, 212 Mich App 67, 69; 536 NW2d 809 (1995). The defendant bears a

---

[6] *People v Maloy*, unpublished order of the Court of Appeals, issued March 27, 2014 (Docket No 317929).

heavy burden of showing that counsel's performance was deficient and that he was prejudiced by the deficiency. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

Defendant claims that his relationship with his attorney was strained, and that the trial court should have conducted an investigation into the representation given defendant's claim that counsel had not visited him as of February 26, 2013. Despite these assertions, there is nothing on the record to establish that defendant's counsel did not prepare for defendant's trial or meet with him to discuss trial strategy before the trial date of June 3, 2013. Further, the record establishes that defendant's counsel filed discovery requests and also sought the preliminary examination transcript on January 31, 2013. Defense counsel was engaged, moved for a directed verdict based on his belief that the prosecution had not established identity beyond a reasonable doubt, asked questions of defendant regarding his alibi defense, and also argued strongly during closing argument that defendant had not been identified beyond a reasonable doubt by the witnesses. While an ineffective assistance claim can be based on the counsel's alleged unpreparedness or lack of preparation, prejudice must be shown. *People v Caballero*, 184 Mich App 636, 640; 459 NW2d 80 (1990).

While defendant argues that counsel was ineffective because he failed to obtain phone records that would have supported his alibi, there is no evidence in the record that such records existed or that those records would have proved defendant's whereabouts. Counsel elicited information regarding defendant's alibi during direct examination. Decisions regarding evidence or defense strategy are firmly within the attorney's discretion, which will not be second guessed on appeal, *People v Horn*, 279 Mich App 31, 38; 755 NW2d 212 (2008), especially when no prejudice can be shown, *Caballero*, 184 Mich App at 640. We find no ineffective assistance of counsel on these facts.

## F. DEFENDANT'S SELF-REPRESENTATION CLAIM

Defendant also argues that the trial court erred by not permitting him to represent himself at trial. We disagree.

While defendant represented himself at the preliminary examination, the record of the circuit court proceedings is wholly devoid of any on-the-record request by defendant to represent himself at trial. Thus, this issue has not been properly preserved for appellate review.[7] *Metamora Water Serv*, 276 Mich App at 382. Our review is limited to plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764.

The Sixth Amendment of the United States Constitution explicitly guarantees a defendant in a criminal case the right to the assistance of counsel and implicitly guarantees the right of self-representation. US Const, Am VI; *Faretta v California*, 422 US 806, 818-832; 95 S Ct 2525; 45 L Ed 2d 562 (1975). "[A] defendant has a constitutional entitlement to represent himself or to be

---

[7] In a letter of February 26, 2013, defendant informed the court that he would proceed "pro per." However, this letter was attached to defendant's motion to suppress and there is no indication that defendant ever formally requested the ability to represent himself.

represented by counsel—but not both." *People v Dennany*, 445 Mich 412, 442; 519 NW2d 128 (1994). "[T]he right of self-representation and the right to counsel are mutually exclusive[;] a defendant must elect to conduct his own defense voluntarily and intelligently, and must be made aware of the dangers and disadvantages of self-representation in order to proceed pro se." *People v Russell*, 471 Mich 182, 189; 684 NW2d 745 (2004) (citations and quotation marks omitted). Before a defendant may represent himself, the trial court must determine that (1) the defendant's request is unequivocal; (2) the defendant is asserting his right knowingly, intelligently, and voluntarily; and (3) the defendant's self-representation will not disrupt, unduly inconvenience, and burden the court. *Id*. at 190. In addition, pursuant to MCR 6.005, the trial court has a duty to inform the defendant of the charge and penalty he faces, advise him of the risks of self-representation, and offer him the opportunity to consult with retained or appointed counsel.

Defendant never made an unambiguous request for counsel on the record. Rather, defendant indicated in a letter more than three months before trial that he was unhappy with defense counsel and that we would represent himself. This request was not made in a formal motion and defendant never requested to represent himself again at the time of trial. Accordingly, at best, defendant's request for self-representation was ambiguously made three months before trial. As the Supreme Court explained in *Russell*, 471 Mich at 193:

> [T]o the degree that defendant's refusal to explicitly choose between continued representation by appointed counsel and self-representation created any ambiguity regarding defendant's desire to unequivocally waive his right to trial counsel, any ambiguity should have been resolved in favor of representation because, consistently with [*People v Adkins (After Remand)*, 452 Mich 702; 551 NW2d 108 (1996)] and United States Supreme Court precedent, courts *must* indulge every reasonable presumption against the waiver of the right to counsel. [Emphasis in original.]

For a waiver of the right to counsel to occur, "[t]he record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandably rejected the offer. Anything less is not waiver." *Adkins*, 452 Mich at 721. Defendant never specifically requested the right to represent himself by way of a motion before the trial court or on the record at trial. Indeed, he requested the appointment of counsel. While it is true that defendant represented himself at the preliminary examination, waiver of counsel must be made at all stages of the proceedings to be effective. *People v Anderson* (*After Remand*), 446 Mich 392, 402; 521 NW2d 538 (1994); *People v Marsack*, 231 Mich App 364, 377; 586 NW2d 234 (1998).

Based on this record, it cannot be said that defendant made an unequivocal, unambiguous waiver of his right of counsel and that he was choosing to represent himself at trial. As such, we conclude that defendant's claim must fail.

## G. DEFENDANT'S PHOTOGRAPHIC IDENTIFICATION CHALLENGE

Defendant argues that because he was not present or represented by counsel at the photographic lineup, the trial court erred by permitting the identification evidence to be admitted at trial. We disagree.

While defendant filed a motion to suppress the identification before trial, defendant failed to provide a supplemental brief on the issue as the trial court ordered. Defendant also failed to object to the admission of the evidence at trial. Thus, this issue is unpreserved, *Metamora Water Serv*, 276 Mich App at 382, and our review is limited to plain error affecting defendant's substantial rights, *Carines*, 460 Mich at 763; *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003).

The Sixth Amendment right to counsel "attaches only to corporeal identifications conducted at or after the initiation of adversarial judicial criminal proceedings." *People v Hickman*, 470 Mich 602, 609; 684 NW2d 267 (2004). Adversarial judicial criminal proceedings are identified as those that include formal charges, preliminary hearings, indictments, or arraignments. *Id*. at 607. Here, the photographic lineup was conducted on October 10, 2012, nine days following the home invasion. Charges were not brought against defendant until the issuance of the warrant on November 6, 2012, nearly one month following the photographic lineup. Therefore, defendant had no right to counsel at the time of the photographic lineup.

Further, defendant has not alleged that the photographic lineup was in any way improperly suggestive or otherwise conducted in an improper manner. *People v Kurylczyk*, 443 Mich 289, 303, 310-311, 318; 505 NW2d 528 (1993); *People v Johnson*, 202 Mich App 281, 284-284; 508 NW2d 509 (1993). Therefore, defendant cannot show any prejudice resulting from the fact that he was not represented by counsel at the lineup.

## H. DEFENDANT'S SENTENCING CHALLENGES

Defendant raises three arguments regarding his sentence. He first argues that the trial court failed to take into account mitigating factors when sentencing him to 114 to 480 months in prison. Second, he challenges the scoring of offense variable (OV) 16 and prior record variable (PRV) 6. Third, defendant argues that his attorney was ineffective in failing to challenge the sentencing based on these issues. We disagree with each of defendant's arguments. Defendant failed to preserve his sentencing issues for appellate review. Therefore, review of these issues is limited to for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764.

Defendant first contends that he is entitled to resentencing because the trial court did not take into account certain mitigating factors. Specifically, defendant argues that the court should have taken into account the fact that he was remorseful and also should have taken into account his history of drug abuse and mental illness. However, generally, Michigan law does not require that mitigating factors beyond those referenced in the PSIR be considered when sentencing a defendant to a minimum term within the guidelines. See *People v Osby*, 291 Mich App 412, 416; 804 NW2d 903 (2011).

While defendant has relied on *People v Petri*, 279 Mich App 407, 422; 760 NW2d 882 (2008), for the proposition that "[a] defendant's mental health and substance abuse history, independently documented for the court by the probation department, are factors the court may

consider and from which it can draw inferences about the defendant's behavior," our review of *Petri* does not provide any authority for defendant's proposition. Rather, *Petri*, 279 Mich App at 421-422, discusses when and what factors a court should and can use in departing upward from the sentencing guidelines, and reiterates that a court "shall not base a departure on an offense characteristic or offender characteristic already taken into account in determining the appropriate sentence range unless the court finds from the facts contained in the court record . . . that the characteristic has been given inadequate or disproportionate weight."

In the instant case, there is nothing in the record to suggest that defendant's mental health and substance abuse history was not given appropriate weight by the court. Indeed, the PSIR recommended that defendant be sentenced to a minimum term of 126 months. The trial court imposed a minimum sentence one full year shorter than the sentence recommended in the PSIR. Accordingly, we cannot say that the trial court failed to take into account all relevant factors when it sentenced defendant.

Likewise, while defendant has alleged that the trial court failed to take into consideration his remorse, there is no requirement that the court reduce a defendant's sentence because of the remorse shown by the defendant. Case law merely provides that "evidence of a lack of remorse can be considered in determining an individual's potential for rehabilitation." *People v Dodek*, 274 Mich App 58, 104; 732 NW2d 546 (2007).

Finally, to the extent that the trial court erred by not providing reasons for imposing the maximum sentence of 40 years or "any reasons why both the minimum and maximum sentences were proportionate to the offense," defendant's challenge fails. As the record establishes, defendant was sentenced as a third habitual offender. The maximum statutory sentence was 40 years. See MCL 750.110a(5); MCL 769.11(1)(a). It is also undisputed that defendant was sentenced to a minimum sentence of 114 months, which fell squarely within the guidelines range of 72 months to 180 months. "A sentence that falls within the appropriate sentencing guidelines range is presumptively proportionate." *People v Armisted*, 295 Mich App 32, 51; 811 NW2d 47 (2011). We perceive no plain error.

Further, defendant's ineffective assistance of counsel claim regarding this issue fails. There is simply no evidence that defendant's sentence would have been different if his attorney had taken additional steps to point out the aforementioned, alleged mitigating factors. Defendant has also failed to establish ineffective assistance of counsel regarding this sentencing challenge.

Defendant challenges the scoring of OV 16. The trial court scored one point for OV 16, which is appropriate when the value of "property obtained, damaged, lost, or destroyed" has a value of at least $200 but not more than $1,000. MCL 777.46(1)(d). Defendant argues there was not sufficient evidence to support that score. But even if OV 16 was improperly scored, the error was harmless because correction of the scoring error would not change the sentencing guidelines

applicable to defendant.[8] Therefore, resentencing is not required. See *People v Francisco*, 474 Mich 82, 92 n 8; 711 NW2d 44 (2006).

Defendant further argues that there was not sufficient evidence to support a score of 10 points for PRV 6. We disagree. Under MCL 777.56(1)(c), the trial court may assess 10 points whenever "[t]he offender is on parole, probation, or delayed sentence status or on bond awaiting adjudication or sentencing for a felony." In this case, the record reveals that defendant was both on parole and awaiting sentencing in an unrelated felony at the time of sentencing. There was sufficient evidence to support the score of 10 points for PRV 6.

Nor was counsel ineffective for failing to object to the scoring of OV 16 and PRV 6. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *Ericksen*, 288 Mich App at 201.

Affirmed.

/s/ Jane M. Beckering
/s/ Kathleen Jansen
/s/ Mark T. Boonstra

---

[8] If zero points had been assessed for OV 16, defendant's total OV score would have been 20 points instead of 21 points. Thus, defendant still would have fallen within OV level II, and defendant's minimum guidelines range of 72 to 180 months would have remained exactly the same.